WO

# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Eva Pepaj, et al., | No. CV-19-01438-PHX-MTL |
| Plaintiffs, | **ORDER** |
| v. | |
| Paris Ultra Club LLC, | |
| Defendant. | |

Before the Court are the parties' *Daubert* motions to exclude certain expert witnesses (Docs. 37, 50–51) and cross-motions for summary judgment (Docs. 39–40). The Court rules as follows.[1]

## I. BACKGROUND

This case is one of many similar cases within this district.[2] Defendant Paris Ultra Club, LLC ("Paris Ultra") operates Paris In Scottsdale (the "Club"), a nightclub in Scottsdale, Arizona. (Doc. 12 ("FAC") ¶ 22.) Plaintiffs Eva Pepaj, Paola Canas, CJ Gibson,

---

[1] The Court finds the pending motions appropriate to resolve without oral argument. *See* LRCiv 7.2(f).

[2] Each case relates to the unauthorized use of models' photographs and alleges similar claims of false light, right of publicity, and Lanham Act violations. *See Mitcheson v. El Antro, LLC*, No. CV-19-01598-GMS (D. Ariz. filed Mar. 8, 2019); *Ratchford v. Dalton Corp.*, No. CV-19-01421-SRB (D. Ariz. filed Feb. 28, 2019); *Longoria v. Whitefeather Ventures, LLC*, No. CV-18-00394-SHR (D. Ariz. filed Aug. 10, 2018); *Gray v. LG&M Holdings, LLC*, No. CV-18-02543-SRB (D. Ariz. filed Aug. 10, 2018); *Takeguma v. Freedom of Expression, LLC*, No. CV-18-02552-MTL (D. Ariz. filed Aug. 10, 2018); *Pinder v. 4716 Inc.*, No. CV-18-02503-RCC (D. Ariz. filed Aug. 7, 2018); *Longoria v. Kodiak Concepts, LLC*, No. CV-18-02334-DWL (D. Ariz. filed July 25, 2018); *Electra v. Idaho Bus. Holdings, LLC*, No. CV-18-01604-SRB (D. Ariz. filed May 25, 2018); *Geiger v. Creative Impact Inc.*, No. CV-18-01443-JAT (D. Ariz. filed May 10, 2018).

Danielle Ruiz, Claudia Sampedro, and Alana Campos are models. (*Id.* ¶ 1.) Between March 2016 and February 2019, Paris Ultra used images of Plaintiffs in advertisements posted online via the Club's social media. (*Id.* ¶¶ 38–43.) No Plaintiff has been employed by or has otherwise given permission to Paris Ultra to use her image to advertise, promote, market, or endorse the Club. (Doc. 39 at 3.)

Plaintiffs initiated this lawsuit on March 1, 2019. (Doc. 1.) They assert three claims against Paris Ultra: (1) Misappropriation of Likeness; (2) Violations of the Lanham Act, 15 U.S.C. § 1125(a); and (3) False Light Invasion of Privacy. (FAC at 13–19.) The parties have retained expert witnesses and now move to strike one another's experts. (Docs. 37, 50–51.) The parties also move for summary judgment on all claims. (Docs. 39–40.)

## II.   LEGAL STANDARDS

### A.   *Daubert* Standard

A party seeking to offer expert testimony must establish that the testimony satisfies Rule 702 of the Federal Rules of Evidence. Rule 702 provides:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:
>
> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
>
> (b) the testimony is based on sufficient facts or data;
>
> (c) the testimony is the product of reliable principles and methods; and
>
> (d) the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702.

As a gatekeeper, trial judges make a preliminary assessment as to whether expert testimony is admissible. *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 589, 597 (1993). Specifically, "the trial judge must ensure that any and all scientific testimony or evidence admitted is not only relevant, but reliable." *Id.* at 589. To meet the requirements

of Rule 702, an expert must be qualified, the expert's opinion must be reliable in that it is based on sufficient facts or data and is the product of reliable principles and methods, and the expert's testimony must fit the case such that the expert's opinion is relevant. *Id.* 589–95. The Rule 702 inquiry is "flexible." *Id.* at 594. The focus "must be solely on principles and methodology, not on the conclusions that they generate." *Id.* at 595. Because the requirements of Rule 702 are conditions for determining whether expert testimony is admissible, a party offering expert testimony must show by a preponderance of the evidence that the expert's testimony satisfies Rule 702. Fed. R. Evid. 104(a); *see also Lust v. Merrell Dow Pharms. Inc.*, 89 F.3d 594, 598 (9th Cir. 1996).

## B.    Summary Judgment Standard

Summary judgment is appropriate if the evidence demonstrates "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A genuine issue of material fact exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party," and material facts are those "that might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). At the summary judgment stage, "[t]he evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in [its] favor." *Id.* at 255. "[A] party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). A party opposing summary judgment must "cit[e] to particular parts of materials in the record" establishing a genuine dispute or "show[] that the materials cited do not establish the absence of . . . a genuine dispute." Fed. R. Civ. P. 56(c)(1). This Court has no independent duty "to scour the record in search of a genuine issue of triable fact." *Keenan v. Allan*, 91 F.3d 1275, 1279 (9th Cir. 1996) (internal quotations omitted).

Where, as here, "parties submit cross-motions for summary judgment, each motion must be considered on its own merits." *Fair Hous. Council of Riverside Cnty. v. Riverside*

*Two*, 249 F.3d 1132, 1136 (9th Cir. 2001) (citations and internal quotations omitted). The summary judgment standard operates differently depending on whether the moving party has the burden of proof. *See Celotex Corp.*, 477 U.S. at 322–23. As the party with the burden of proof, a plaintiff "must establish beyond controversy every essential element" of her claims based on the undisputed facts. *S. Cal. Gas Co. v. City of Santa Ana*, 336 F.3d 885, 888 (9th Cir. 2003) (internal quotations omitted). A defendant, by contrast, is entitled to summary judgment where it shows that a plaintiff cannot establish at least one element of a claim considering the undisputed material facts. *Celotex Corp.*, 447 U.S. at 322–23.

## III.   DISCUSSION

### A.   *Daubert* Motions

Both parties have moved to strike one another's experts.[3] (Docs. 37, 50–51.) Because the experts' testimony is material to the Court's evaluation of the parties' summary judgment motions, the Court will first address the parties' *Daubert* motions.

#### 1.   Martin Buncher

Plaintiffs hired Martin Buncher to conduct a survey to measure the likelihood of consumer confusion that resulted from Paris Ultra's use of Plaintiffs' images. (Doc. 51–2 at 5.) Paris Ultra challenges the reliability and relevance of Mr. Buncher's survey and corresponding report. (Doc. 51 at 2.)

If a survey is conducted according to accepted principles, the survey evidence is sufficiently reliable under *Daubert*. *Southland Sod Farms v. Stover Seed Co.*, 108 F.3d 1134, 1143 n.8 (9th Cir. 1997). Objections regarding "technical inadequacies" of a survey, "bear on the weight of the evidence, not its admissibility." *Keith v. Volpe*, 858 F.2d 467, 480 (9th Cir. 1988). Mr. Buncher has 55 years of experience conducting market research and providing marketing consulting services. (Doc. 51–2 at 6.) His report states that "[t]he survey sample selection, questions, questionnaire design, and interviewing procedures employed in [his] survey were specifically designed in accordance with the generally

[3] Plaintiffs argue Paris Ultra's *Daubert* motions are untimely and request that they be stricken. (Doc. 55 at 1–2; Doc. 56 at 2–3.) Because Plaintiffs had ample time to oppose and argue the merits of Paris Ultra's *Daubert* motions, the Court, in its discretion, will address the motions' merits.

accepted standards and procedures in the fielding of surveys set forth by the American Marking Association" and other organizations. (*Id.* at 7.) Mr. Buncher's report explains his methodology and how his methodology conforms with generally accepted principles. (*Id.* at 7–26.)

Paris Ultra challenges the reliability of Mr. Buncher's survey on the following grounds: (1) the survey lacked a control group or adequate control question; (2) the survey's wording is confusing and misleading and answer choices are inadequate; (3) the survey relies on an unrepresentative sample; and (4) the survey does not account for respondents' prior exposure to the advertisements. (Doc. 51 at 8–15.) Those objections go to the weight of Mr. Buncher's survey, not its admissibility. *See Keith*, 858 F.2d at 480 (finding a "survey's general trustworthiness, the clarity of the survey questions, the qualifications, and the objectivity of the survey" to be technical inadequacies); *ThermoLife Int'l, LLC v. Gaspari Nutrition, Inc.*, 648 F. App'x 609, 613 (9th Cir. 2016) (concluding an unrepresentative sample does not preclude a survey's admissibility); *Hadley v. Kellogg Sales Co.*, 324 F. Supp. 3d 1084, 1110 (N.D. Cal. 2018) (holding a "focalism bias objection goes to the weight, and not to the admissibility" of a proffered survey); *Mattel, Inc. v. MCA Recs., Inc.*, 28 F. Supp. 2d 1120, 1135 (C.D. Cal. 1998) (finding a survey's lack of a control group was a technical unreliability). The Court finds that Mr. Buncher conducted the survey according to accepted principles, and thus his survey is sufficiently reliable. *See Southland Sod Farms*, 108 F.3d at 1143 n.8.

Expert testimony is relevant if the testimony is sufficiently tied to the facts of a case such that it will aid the jury in understanding evidence or resolving a factual dispute. *Daubert*, 509 U.S. at 591. Plaintiffs assert false light claims, misappropriation claims, and claims under the Lanham Act. (FAC at 13–19.) Mr. Buncher's survey and report will assist the trier of fact in determining whether Paris Ultra's use of Plaintiffs' images deceived consumers or implied that Plaintiffs promoted, endorsed, or were otherwise associated with the Club. Thus, the Court finds that Mr. Buncher's survey and report are relevant.

"[S]urvey evidence should be admitted as long as it is conducted according to

1 accepted principles and is relevant." *Fortune Dynamic, Inc. v. Victoria's Secret Stores*

2 *Brand Mgmt., Inc.*, 618 F.3d 1025, 1036 (9th Cir. 2010) (internal quotations omitted).

3 Mr. Buncher's survey meets both requirements by a preponderance of the evidence. Thus,

4 the Court will deny Paris Ultra's Motion to Strike the Report and Testimony of Martin

5 Buncher (Doc. 51).

6       **2. Stephen Chamberlin**

7    Plaintiffs retained Mr. Chamberlin to testify as to their damages. Paris Ultra moves

8 to strike Mr. Chamberlin's report and testimony, alleging his opinion is unreliable.

9 (Doc. 50 at 2.) Expert testimony must be "properly grounded, well-reasoned, and not

10 speculative before it can be admitted." Fed. R. Evid. 702 Advisory Committee Notes to

11 2000 Amendments. An expert's testimony "must be grounded in an accepted body of

12 learning or experience in the expert's field, and the expert must explain how the conclusion

13 is so grounded." *Id.*; *see Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 156 (1999)

14 ("[N]o one denies that an expert might draw a conclusion from a set of observations based

15 on extensive and specialized experience."). Mr. Chamberlin has 30 years of experience in

16 the model and talent industry. (Doc. 50–10 at 4.) His valuations of Plaintiffs' day rates are

17 based on his experience and consideration of specific factors listed in his report. (*Id.* at 31,

18 43, 58, 70; Doc. 50–11 at 22, 34.) Mr. Chamberlin assumed, based on his experience, that

19 Plaintiffs would receive the same rate for each use of their image and multiplied Plaintiffs'

20 day rates by Paris Ultra's different "usages." (Doc. 50–10 at 32.) Paris Ultra argues

21 Mr. Chamberlin improperly calculated Plaintiffs' day rates and used an arbitrary usage

22 multiplier. (Doc. 50 at 2.) But those objections go to the weight of Mr. Chamberlin's

23 testimony, not its admissibility. *See Kennedy v. Collagen Corp.*, 161 F.3d 1226, 1231 (9th

24 Cir. 1998) ("Disputes as to . . . faults in [an expert's] use of [a particular] methodology

25 . . . go to weight, not the admissibility, of his testimony.").

26    The Court finds that Mr. Chamberlin's testimony is grounded in his three decades

27 of experience in the model and talent industry and his report adequately explains how his

28 conclusions are so grounded. Because Plaintiffs have met their burden of showing by a

preponderance that Mr. Chamberlin's expert testimony is reliable, Paris Ultra's Motion to Strike the Report and Testimony of Stephen Chamberlin (Doc. 50) is denied.

### 3.     Dr. Michael Einhorn

Paris Ultra retained Dr. Einhorn to testify as to the value of Plaintiffs' damages. Plaintiffs move to strike Dr. Einhorn's report and testimony, challenging his qualifications and the reliability and relevance of his opinion. (Doc. 37 at 9–15.) Rule 702 requires this Court to evaluate whether a proffered witness "is qualified as an expert by knowledge, skill, experience, training, or education." Fed. R. Evid. 702. "The qualification standard is meant to be broad and to seek a 'minimal foundation' justifying the expert's role as an expert." *Allen v. Am. Cap. Ltd.*, 287 F. Supp. 3d 763, 776 (D. Ariz. 2017) (quoting *Hangarter v. Provident Life & Accident Ins. Co.*, 373 F.3d 998, 1015–16 (9th Cir. 2004)). A minimal foundation is established if a proffered expert has years of relevant experience. *Hangarter*, 373 F.3d at 1015–16. The Court finds that Dr. Einhorn's 19 years of experience providing valuation services in areas including intellectual property lays at least the minimal foundation of knowledge, skill, and experience required under Rule 702. (Doc. 37–1 at 4.) Paris Ultra has therefore established by a preponderance that Dr. Einhorn is qualified to opine on the value of Plaintiffs' damages. *See, e.g.*, *Mitcheson v. El Antro LLC*, No. CV-19-01598-PHX-GMS, 2020 WL 7075239, at *2 (D. Ariz. Dec. 3, 2020) (finding Dr. Einhorn to be sufficiently qualified in a similar case).

Expert testimony must be "properly grounded, well-reasoned, and not speculative before it can be admitted." Fed. R. Evid. 702 Advisory Committee Notes to 2000 Amendments. An expert's testimony "must be grounded in an accepted body of learning or experience in the expert's field, and the expert must explain how the conclusion is so grounded." *Id.* As noted, Dr. Einhorn has 19 years of experience providing valuation services in the fields of intellectual property, media, and entertainment. The Court finds that Dr. Einhorn's report sufficiently explains how his conclusions are grounded in his experience. (*See* Doc. 37–1 at 58–69.) Thus, Paris Ultra has met its burden of showing Dr. Einhorn's expert testimony is reliable.

Expert testimony is relevant if the testimony is sufficiently tied to the facts of a case such that it will aid the jury in understanding evidence or resolving a factual dispute. *Daubert*, 509 U.S. at 591. The Court finds that Dr. Einhorn's opinion will aid the jury in determining the extent of Plaintiffs' damages, and thus Paris Ultra has met its burden of showing by a preponderance that Dr. Einhorn's opinion is relevant. Because Dr. Einhorn is qualified to give expert testimony on the issue of Plaintiffs' damages, his methodology is sufficiently reliable, and his opinion is relevant, Plaintiffs' Motion to Strike the Expert Report and Testimony of Michael Einhorn (Doc. 37) is denied.

### B.   Summary Judgment Motions

The parties move for summary judgment on all of Plaintiffs' claims.[4] (Docs. 39–40.) Ms. Pepaj, Ms. Canas, Ms. Ruiz, Ms. Sampedro, and Ms. Campos assert claims arising under Arizona law. (FAC at 13, 18.) All Plaintiffs allege claims for violations of the Lanham Act. (*Id.* at 15.) The Court will first address the state law claims.

#### 1.   Arizona Claims

##### a.   Invasion of Privacy by False Light

Under Arizona law, claims for invasion of privacy by false light are subject to a one-year statute of limitations. *Watkins v. Arpaio*, 239 Ariz. 168, 173 (App. 2016) (applying a one-year statute of limitations to a false light claim); *see Albano v. Shea Homes Ltd.*, 634 F.3d 524, 528 (9th Cir. 2011) ("[S]tatutes of limitations are substantive in nature, and, therefore, state statutes of limitations appl[y] [to state law claims]."). Plaintiffs' initiated this case on March 1, 2019. (Doc. 1.) The parties do not dispute that Paris Ultra published

---

[4] Plaintiffs request that the Court strike Paris Ultra's Separate Statement of Facts. (Doc. 49 at 3 n.2.) Despite the Scheduling Order's express instruction that "the parties may not file separate statements of facts . . . and instead must include all facts in the motion, response, or reply itself," Paris Ultra filed a separate statement of facts in support of its summary judgment motion. (Doc. 15 at 5; Doc. 41.) When resolving the parties' summary judgment motions, the Court did not consider any facts stated in Paris Ultra's Separate Statement of Facts that were not also included in its motion, response, or reply. Because Plaintiffs are not prejudiced by Paris Ultra's unauthorized filing, the Court, in its discretion, will not strike the Separate Statement of Facts. *See Miranda v. S. Pac. Transp. Co.*, 710 F.2d 516, 521 (9th Cir. 1983) ("District courts have broad discretion in interpreting and applying their local rules."). But the Court will, once again, admonish Paris Ultra's counsel for ignoring this provision of the Scheduling Order. *See Takeguma v. Freedom of Expression, LLC*, No. CV-18-02552-PHX-MTL, 2021 WL 487884, at *8 n.3 (D. Ariz. Feb. 10, 2021).

four of the relevant advertisements before March 1, 2018, and thus the false light claims arising from those advertisements are barred by the statute of limitations.

Plaintiffs' assert the continuing wrong doctrine in an effort to resurrect their time-barred claims. Although the continuing wrong doctrine exists in Arizona, under the doctrine, "a tort claim based on a series of related wrongful acts is considered continuous" such that "accrual begins at the termination of the wrongdoing, rather than the beginning." *Cruz v. City of Tucson*, 243 Ariz. 69, 74 (App. 2017). There are no continuous acts in this case. Instead, "there is one discrete posting of a Plaintiff's image per claim against Defendant." *Pinder v. 4716 Inc.*, No. CV-18-02503-RCC, --- F. Supp. 3d ---, 2020 WL 6084052, at *4 (D. Ariz. Oct. 15, 2020); *see Watkins*, 239 Ariz. at 173 ("We are unaware of any authority compelling the conclusion that a false-light claim is subject to the 'continuing wrong' doctrine, and we decline [the plaintiff's] request to apply it here."). Because the continuing wrong doctrine does not apply to Plaintiffs' false light claims, the doctrine cannot prolong the one-year statute of limitations. Paris Ultra is therefore entitled to summary judgment on Plaintiffs' false light claims for images published before March 1, 2018. Ms. Sampedro's false light claim for her image published on June 30, 2018 and the false light claims alleged by Ms. Campos and Ms. Pepaj survive the statute of limitations.

Considering the false light claims that are within the limitations period, genuine issues of material fact preclude summary judgment. Arizona "recognize[s] the distinct tort of false light invasion of privacy as articulated by Restatement § 652(E)." *Godbehere v. Phx. Newspapers, Inc.*, 162 Ariz. 335, 342 (1989) (citing the Restatement (Second) of Torts (the "Restatement Second") § 625E (1977)). Under the Restatement Second,

> One who gives publicity to a matter concerning another that places the other before the public in a false light is subject to liability to the other for invasion of his privacy, if
>
> (a) the false light in which the other was placed would be highly offensive to a reasonable person, and
>
> (b) the actor had knowledge of or acted in reckless disregard as to the falsity of the publicized matter and the false light in which the other would be placed.

- 9 -

Restatement Second § 652(E).

"A false light cause of action may arise when something untrue has been published about an individual, *or* when the publication of true information creates a false implication about the individual." *Godbehere*, 162 Ariz. at 341 (emphasis in original) (internal citations omitted). Thus, the fact the advertisements include accurate depictions of Ms. Sampedro, Ms. Campos, and Ms. Pepaj does not preclude their false light claims.

There is, however, a triable issue as to whether being associated with Paris Ultra would be highly offensive to a reasonable person. *See Desert Palm Surgical Grp., P.L.C. v. Petta*, 236 Ariz. 568, 580 (App. 2015) (concluding the "jury was in the best position to resolve . . . material questions of fact" as to whether a defendant's statements "painted Plaintiffs in a false light"). To be actionable, "the publication must involve a major misrepresentation of the plaintiff's character, history, activities or beliefs, not merely minor or unimportant inaccuracies." *Godbehere*, 162 Ariz. at 341 (internal quotations omitted). Paris Ultra alleges there is "simply nothing offensive about a nightclub" and that Plaintiffs "agreed to pose in undoubtedly risqué positions and wardrobe" in the original images. (Doc. 40 at 18.) But Paris Ultra's briefing refers to the Club as a "gentlemen's club," not merely a nightclub. (*Id.* at 15.) And Paris Ultra conflates consent to take a photograph for a discrete purpose with consent that the image be used in connection with an unrelated business. *See Godbehere*, 162 Ariz. at 341 n.2 (citing *Douglass v. Hustler Mag., Inc.*, 769 F.2d 1128 (7th Cir. 1985)) (explaining that a plaintiff who posed nude and consented to the publication of her photographs in Playboy magazine could recover for false light invasion of privacy when her photographs were instead published in Hustler magazine because the "jury may have focused on the differences between Playboy and Hustler and concluded that to be published in Hustler, as if she had posed for that publication, falsely placed her in a different light than the Playboy publication"). A reasonable jury could conclude that association with the Club placed Ms. Pepaj, Ms. Campos, and Ms. Sampedro in a different light than the publications of their original images. Thus, the Court cannot conclude as a matter of law that association with the Club would not be highly offensive

to a reasonable person.

There is also a triable issue as to whether Paris Ultra acted with actual malice—or had knowledge of or acted in reckless disregard as to the falsity of the publicized matter. Generally, "[a]ctual malice is a question of fact for a jury." *Miller v. Servicemaster by Rees*, 174 Ariz. 518, 520 (App. 1992). Paris Ultra contends it "did not act knowingly or recklessly" because it "simply reproduced" images that were "already publicly available." (Doc. 40 at 19.) But it is undisputed that Paris Ultra knew that it did not have Ms. Pepaj, Ms. Campos, or Ms. Sampedro's consent to use their respective images. And no Plaintiff has been employed or compensated by Paris Ultra. Considering those facts, a reasonable jury could infer that Paris Ultra knowingly published false information by implying that Plaintiffs were associated with the Club. *Solana v. Playgirl, Inc.*, 292 F.3d 1078, 1085 (9th Cir. 2002) ("The subjective determination of whether the defendant in fact entertained serious doubts as to the truth of the statement may be proved by inference, as it would be rare for a defendant to admit such doubts."). But it is also true that a reasonable factfinder could reject an inference of knowledge from the facts above. Thus, the Court cannot determine as a matter of law whether Paris Ultra acted with actual malice.

Paris Ultra argues that Ms. Pepaj, Ms. Campos, or Ms. Sampedro's false light claims fail because such claims only provide relief for mental and emotional injury and "Plaintiffs have not claimed such damages here." (Doc. 40 at 19.) But, under a false light claim, "a plaintiff may recover . . . as long as the publicity is unreasonably offense and attributes false characteristics." *Godbehere*, 162 Ariz. at 341. "[T]he false innuendo created by the highly offensive presentation of a true fact constitutes the injury." *Reynolds v. Reynolds*, 231 Ariz. 313, 318 (App. 2013). In this case, Plaintiffs allege Paris Ultra's advertisements falsely imply that they are employed by or have agreed to endorse or promote the Club. As noted, there is a triable issue as to whether such affiliation is unreasonably offensive. Thus, the Court rejects Paris Ultra's argument.[5]

---

[5] The Court is unpersuaded by Paris Ultra's argument that Plaintiffs' false light claims are barred because they "'claim' to be celebrities." (Doc. 40 at 19.) Although the Arizona Supreme Court has held that "a plaintiff cannot sue for false light invasion of privacy if he or she is a public official *and* the publication relates to performance of his or her public life

1
2
3
4
5

In sum, Paris Ultra is entitled to summary judgment on Plaintiffs' false light claims for images published before March 1, 2018. Ms. Sampedro's false light claim for her image published on June 30, 2018 and the false light claims alleged by Ms. Campos and Ms. Pepaj survive the statute of limitations, but there are genuine disputes of material fact that preclude summary judgment in favor of either party on those claims.

6

**b.     Common Law Right of Publicity**

7
8
9

Plaintiffs and Paris Ultra both argue they are entitled to summary judgment on Plaintiffs' claims for violations of the common law right of publicity. (Doc. 39 at 5; Doc. 40 at 8.) The Court will address the parties' arguments in turn.

10

**i.      Arizona Recognizes a Right of Publicity**

11
12
13
14
15
16
17
18

The Court finds that "Arizona recognizes a right of publicity." *In re Estate of Reynolds*, 235 Ariz. 80, 85 (App. 2014).[6] The appellate court's holding in *Estate of Reynolds* is not obiter dictum as Paris Ultra suggests. Rather, recognizing the right of publicity was necessary to the court's decision that, although the right of publicity exists and is descendible in Arizona, the plaintiff could not establish a violation under the facts of the case. *Id.* at 85; *see Dictum*, Black's Law Dictionary (11th ed. 2019) (defining "obiter dictum" as "[a] judicial comment made while delivering a judicial opinion, but one that is unnecessary to the decision in the case and therefore not precedential").

19
20
21
22

The Court also rejects Paris Ultra's argument that A.R.S. § 12-761 deprives non-soldiers of the right to publicity. (Doc. 40 at 9.) That law provides: "The right to control and to choose whether and how to use a soldier's name, portrait or picture for commercial purposes is recognized as each soldier's right of publicity." A.R.S. § 12-761(A). The statute

23
24
25
26

or duties," *Godbehere*, 162 Ariz. at 343, there is no indication that this exception applies more broadly to other types of notoriety and Paris Ultra provides no analysis or explanation as to why Ms. Pepaj, Ms. Campos, and Ms. Sampedro are public figures under Arizona law. *See Wright v. Old Gringo Inc.*, No. 17-CV-1996-BAS-NLS, 2018 WL 6788215, at *3 (S.D. Cal. Dec. 26, 2018) ("[M]erely making a conclusory argumentative statement without citation to law or analysis is insufficient either to competently raise the argument for judicial consideration or for a party to meet its burden on summary judgment.").

27
28

[6] The Court finds no indication that the Arizona Supreme Court would not recognize an individual right of publicity. *In re Kirkland*, 915 F.2d 1236, 1239 (9th Cir. 1990) (internal quotations and citations omitted) ("In the absence of convincing evidence that the highest court of the state would decide differently, a federal court is obligated to follow the decisions of the state's intermediate courts.").

continues: "The rights and remedies provided in this section supplement any other rights and remedies provided by law, including the common law right of privacy." A.R.S. § 12-761(E). Arizona courts presume that statutes do not change or abrogate common law causes of action unless the Legislature clearly manifests an intent to do so. *Orca Commc'ns Unlimited, LLC v. Noder*, 236 Ariz. 180, 182 (2014). The text of A.R.S. § 12-761 suggests that the Legislature intended to preserve, not eliminate, the common law right of privacy.

Paris Ultra's argument based on the Revised Arizona Jury Instructions (the "RAJI") is also flawed. (Doc. 40 at 8.) The Arizona Supreme Court "decided not to issue or qualify approvals for any jury instructions." RAJI (CIVIL) 6th Important Notice. Thus, the RAJI's use is noncompulsory. *See Pinder*, 2020 WL 6084052 at *10. Because the Court finds that Arizona recognizes the right of publicity, the Court must next address whether Plaintiffs' right of publicity claims are time-barred.

### ii.      Statute of Limitations

Paris Ultra argues that Plaintiffs' right of publicity claims are barred by a one-year statute of limitations. (Doc. 40 at 19–20.) "[W]hen a defendant asserts the statute of limitations as a defense, the defendant has the burden of proving that the [claim] falls within the statute." *Troutman v. Valley Nat'l Bank of Ariz.*, 170 Ariz. 513, 517 (App. 1992). The Arizona Legislature has not expressly categorized a right of publicity claim within a specific limitations period. Under Arizona law, a one-year limitations period applies to actions for "injuries done to the character or reputation of another," including invasion of privacy by false light claims. A.R.S. § 12-541(1); *see Watkins*, 239 Ariz. at 173. But unlike false light claims, "the right of publicity is in the nature of a property right." *Estate of Reynolds*, 235 Ariz. at 82. In Arizona, property-related torts are subject to a two-year limitations period. *See* A.R.S. § 12-542. Thus, Paris Ultra has not carried its burden.[7]

---

[7] Paris Ultra made no alternative argument that the two-year limitations period in A.R.S. § 12-542 bars Plaintiffs' right of publicity claims. "In our adversarial system of adjudication, we follow the principle of party presentation." *United States v. Sineneng-Smith*, 590 U.S. ----, 140 S. Ct. 1575, 1579 (2020). "[A]s a general rule, our system is designed around the premise that parties represented by competent counsel know what is best for them, and are responsible for advancing the facts and argument entitling them to relief." *Id.* (internal quotations omitted). Thus, the Court will not evaluate whether any Plaintiffs' right of publicity claims are barred by the limitations period in A.R.S. § 12-542.

### iii.    Prima Facie Case

Under Arizona law, "'[o]ne who appropriates the commercial value of a person's identity by using without consent the person's name, likeness, or other indicia of identity for purposes of trade is subject to liability' for resulting damages." *Estate of Reynolds*, 235 Ariz. at 82 (quoting Restatement (Third) of Unfair Competition ("Restatement Third") § 46 (1995)). To be actionable, a defendant's use must "be sufficient to identify the person whose identity the defendant is alleged to have appropriated." Restatement Third § 46, cmt. d. When a defendant is alleged to have appropriated a plaintiff's visual likeness, "the plaintiff must be reasonably identifiable from the photograph." *Id.* Violations of the right of publicity "typically arise out of the unauthorized use of a well-known person's name or likeness in connection with the advertising of goods or services." *Estate of Reynolds*, 235 Ariz. at 83. But, "the identity of even an unknown person may possess commercial value." *Id.* Moreover, "[a]lthough proof of deception or confusion is not an element of liability . . ., the right of publicity indirectly affords protection against false suggestions of endorsement or sponsorship." *Id.* at 82 (quoting Restatement Third § 46, cmt. c).

Plaintiffs argue the undisputed facts establish their right of publicity claims. (Doc. 39 at 6.) Specifically, Plaintiffs allege there is no material dispute that: (1) Paris Ultra "used each Plaintiff's identity in [its] advertisements;" (2) Paris Ultra "sought and obtained a commercial advantage by using these identities by, at minimum, getting Plaintiffs to appear for free in these advertisements;" (3) no Plaintiff has "been employed by, contracted with or has otherwise given permission or consent to [Paris Ultra] to use her Image to advertise, promote, market or endorse [the Club];" and (4) each Plaintiff "was injured by, at minimum, being denied the fair market revenue she would have received but for [Paris Ultra's] misappropriations." (*Id.*) Rather than contest the merits of Plaintiffs' claims, Paris Ultra limits its arguments to the existence of the individual right of publicity in Arizona and the statute of limitations. (Doc. 40 at 8–10, 19–20; Doc. 52 at 6–8, 11.) Paris Ultra therefore fails to identify any material facts to support a finding that a genuine issue remains. And the Court finds that the undisputed facts are sufficient for each Plaintiff to

establish "beyond controversy" the essential elements of her right of publicity claims. *See S. Cal. Gas Co.*, 336 F.3d at 888. The quantity of Plaintiffs' damages remains a triable issue of fact. Plaintiffs sufficiently allege that their damages are, "at minimum," the fair market value of their images. (Doc. 39 at 6.) But Plaintiffs' briefing suggests that Plaintiffs may seek additional damages on their right of publicity claims. Accordingly, the Court will grant summary judgment in Plaintiffs' favor as to liability on the right of publicity, but the measure of each Plaintiff's damages remains a question of fact for trial. *See, e.g.*, *Mitcheson*, 2020 WL 7075239 at \*11 (granting summary judgment in the plaintiffs' favor as to liability under the right of publicity in a similar case).

### 2. The Lanham Act

In addition to the state law claims, all Plaintiffs seek relief under the Lanham Act, 15 U.S.C. § 1125(a). There are two distinct bases of liability under § 1125(a): (1) false association, § 1125(a)(1)(A), and (2) false advertising, § 1125(a)(1)(B). *See Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 122 (2014).

### a. False Association

Both parties seek summary judgment on Plaintiffs' false association claims. The Lanham Act prohibits "the use of any symbol or device which is likely to deceive consumers as to the association, sponsorship, or approval of goods or services by another person." *Wendt v. Host Int'l, Inc.*, 125 F.3d 806, 812 (9th Cir. 1997). The Court considers the following factors, commonly referred to as the *Sleekcraft* factors, to determine whether a likelihood of confusion exists:

        (1)  strength of the plaintiff's mark;

        (2)  relatedness of the goods;

        (3)  similarity of the marks;

        (4)  evidence of actual confusion;

        (5)  marketing channels used;

        (6)  likely degree of purchaser care;

        (7)  defendant's intent in selecting the mark;

(8)  likelihood of expansion of the product lines.

*White v. Samsung Elecs. Am., Inc.*, 971 F.2d 1395, 1400 (9th Cir. 1992). Generally, whether there is a "likelihood of confusion is a factual determination and district courts should grant summary judgment motions regarding the likelihood of confusion sparingly." *Fortune Dynamic, Inc.*, 618 F.3d at 1039 (internal quotations omitted).

In cases involving an alleged celebrity, "'mark' means the celebrity's persona." *White*, 971 F.2d at 1400. The "strength" of a plaintiff's "mark refers to the level of recognition that the celebrity has among the segment of the public to whom the advertisement is directed." *Downing v. Abercrombie & Fitch*, 265 F.3d 994, 1007 (9th Cir. 2001). Plaintiffs have strong social media followings, and Plaintiffs' expert, Mr. Buncher, reported that, on average, 15% of survey respondents recognized Plaintiffs. (Doc. 39 at 13; Doc. 51–2 at 19.) Paris Ultra offers evidence suggesting that Plaintiffs merely engaged in "sporadic modeling and appearance roles" such that their personas are not sufficiently recognizable to give rise to false association claims. (Doc. 40 at 13–15.) And Paris Ultra has raised several objections to Plaintiffs' survey evidence for the factfinder to consider when weighing its probative value. Thus, this factor could tip in favor of either side.

The second factor concerns the "reasons for or source of the plaintiff's fame." *White*, 971 F.2d at 1400. The relevant question is "whether a consumer would be confused as to [Plaintiffs'] association with or sponsorship of [the Club]." *Wendt*, 125 F.3d at 813. Although the parties disagree as to the precise nature of the goods at issue, Paris Ultra's advertising and "at least a portion of [] Plaintiffs' modeling work demonstrate that both parties market female sexuality." *Mitcheson*, 2020 WL 7075239 at *13. Plaintiffs' survey evidence indicates that 86% of respondents believed Plaintiffs "agreed to sponsor, endorse or promote [the Club]." (Doc. 51–2 at 21.) But, the factfinder will have the opportunity to consider Paris Ultra's objections to the survey evidence when weighing its probative value. Thus, there is a triable issue as to the relatedness of the parties' goods.

Paris Ultra concedes the third factor, "similarity of the marks," weighs in Plaintiffs' favor "because the subject photographs are unaltered photographs of the Plaintiffs."

(Doc. 40 at 15.) The fourth factor presents a triable issue of fact. "[S]urvey evidence may establish actual confusion." *Fortune Dynamic, Inc.*, 618 F.3d at 1035. Plaintiffs' survey evidence indicates that 86% of respondents thought Plaintiffs "agreed to sponsor, endorse or promote [the Club]" and 71% of respondents thought Plaintiffs "participate in the events or activities which take place in the Club." (Doc. 46–5 at 21–22.) But Paris Ultra may undermine the weight the trier of fact affords to the survey evidence through questioning the survey's methods during cross-examination.

As to the fifth factor, "the shared use of a ubiquitous marketing channel does not shed much light on the likelihood of consumer confusion." *Network Automation, Inc. v. Advanced Sys. Concepts, Inc.*, 638 F.3d 1137, 1151 (9th Cir. 2011). Both parties use social media to market their goods. Although social media is narrower than all Internet-based marketing, social media is nonetheless a broadly used form of promotion. Thus, this factor sheds little light on the Court's overall analysis but weighs slightly in favor of Plaintiffs.

Sixth, "[l]ow consumer care . . . increases the likelihood of confusion." *Playboy Enters., Inc. v. Netscape Commc'ns Corp.*, 354 F.3d 1020, 1028 (9th Cir. 2004). "Consumer care for inexpensive products is expected to be quite low." *Id.* But when "goods are expensive, [a] buyer can be expected to exercise greater care." *Network Automation, Inc.*, 638 F.3d at 1152. The parties disagree as to the level of care nightclub patrons exercise, and neither party offers evidence to support their assertions. (*See* Doc. 39 at 16; Doc. 40 at 16.) The difficulty of trying to determine with any degree of certainty the level of care that nightclub patrons exercise when choosing between establishments confirms the need for this claim to be heard by a jury. *See Fortune Dynamic, Inc.*, 618 F.3d at 1038.

The seventh factor presents a triable issue of fact. When considering a defendant's intent, the relevant question is whether the defendant "intended to profit by confusing consumers concerning the endorsement of [the defendant's goods]." *White*, 971 F.2d at 1400 (internal quotations omitted). Although Plaintiffs argue Paris Ultra intended to confuse customers by using Plaintiffs' images in the Club's advertising, Paris Ultra denies this allegation. "Issues of credibility, including questions of intent, should be left to the

1   jury." *Harris v. Itzhaki*, 183 F.3d 1043, 1051 (9th Cir. 1999). The eighth factor, the
2   "likelihood of expansion of the product lines," is inapposite where, as here, the case
3   involves an alleged celebrity. *See White*, 971 F.2d at 1401.

4         When "a majority of the *Sleekcraft* factors could tip in either direction," summary
5   judgment should not be granted. *Fortune Dynamic, Inc.*, 618 F.3d at 1039. In this case,
6   there are genuine disputes of material fact as to the strength of Plaintiffs' marks, the
7   relatedness of the goods, evidence of actual confusion, the likely degree of purchaser care,
8   and Paris Ultra's intent. Accordingly, neither Plaintiffs nor Paris Ultra are entitled to
9   summary judgment on Plaintiffs' false association claims.

10         **b.**     **False Advertising**

11         Preliminarily, the Court rejects Paris Ultra's argument that Plaintiffs did not plead
12   or disclose their false advertising claims. The First Amended Complaint ("FAC") alleges
13   "Violation of the Lanham Act, 15 U.S.C. § 1125(a)," which encompasses false association
14   and false advertising. (FAC at 15–18.) The FAC references 15 U.S.C. § 1125(a)(1)(B), the
15   subsection germane to false advertising, and states that Paris Ultra's "unauthorized use and
16   alteration of [Plaintiffs'] images, likenesses, and/or identities as described in this
17   Complaint constitutes false advertising." (*Id.* ¶¶ 58, 61.) The factual allegations in FAC
18   correspond to both subsections of § 1125(a). (*Id.* ¶¶ 57–75.) Thus, Plaintiffs' FAC gives
19   Paris Ultra fair notice of Plaintiffs' false advertisement claims and the grounds on which
20   the claims rest. *See Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007).

21         Nevertheless, Paris Ultra is entitled to summary judgment on Plaintiffs' false
22   advertising claims. To invoke the Lanham's Act cause of action for false advertising, a
23   plaintiff must establish that her alleged injury falls within the "zone of interests" protected
24   by the Lanham Act. *Lexmark Int'l, Inc.*, 572 U.S. at 129–34. To come within the Lanham
25   Act's zone of interests, a plaintiff "must allege an injury to a commercial interest in
26   reputation or sales." *Id.* at 131–32. A plaintiff asserting a false advertising claim need not
27   be in direct competition with a defendant, but the plaintiff must allege harm "related to the
28   plaintiff's success in the market, not just between the parties." *Mitcheson*, 2020

- 18 -

WL 7075239 at *16; *see also Lexmark Int'l, Inc.*, 572 U.S. at 133 ("[C]ommercial injuries from false advertising are derivative of those suffered by consumers who are deceived by the advertising."). Here, Plaintiffs allege they "suffered an injury to their commercial interests in sales by not getting paid for [Paris Ultra's] use of their image." (Doc. 58 at 7.) Plaintiffs are simply claiming that they are entitled to compensation for Paris Ultra's alleged misrepresentations. Plaintiffs offer no common marketplace in which consumer dollars were diverted from Plaintiffs because of Paris Ultra's false claims. Plaintiffs do not offer any evidence that their position in the market has been damaged by Paris Ultra's alleged misrepresentations. *See Lexmark Int'l, Inc.*, 572 U.S. at 137. And Plaintiffs provide no facts suggesting that Paris Ultra's "deception of consumers cause[d] them to withhold trade from" Plaintiffs. *Id.* at 133. Thus, Plaintiffs' alleged injuries are not within the zone of interests that the Lanham Act protects.

Even if Plaintiffs' alleged injuries did implicate the Lanham Act's zone of interests, Plaintiffs have not established a triable issue as to proximate cause. A plaintiff alleging a false advertising claim "must show economic or reputational injury flowing directly from the deception wrought by the defendant's advertising." *Id.* As noted, the harm alleged is that Plaintiffs did not get paid for Paris Ultra's use of their images. (Doc. 39 at 10.) The alleged deception is that, contrary to Paris Ultra's advertisements, Plaintiffs are not affiliated with Paris Ultra and consumers will not find Plaintiffs working at the Club. (*Id.* at 8–9.) Plaintiffs do not offer any facts suggesting that Paris Ultra's allegedly false advertising caused consumers to withhold trade from Plaintiffs. *See Lexmark Int'l, Inc.*, 572 U.S. at 133. Nor do Plaintiffs argue that their injuries are derivative of any harm suffered by consumers deceived by Paris Ultra's advertisements. *See id.* Instead, the facts indicate that Paris Ultra's failure to negotiate with and pay Plaintiffs caused Plaintiffs' alleged injuries. Plaintiffs "cannot obtain relief without *evidence* of injury proximately caused by [Paris Ultra's] alleged misrepresentations." *Id.* at 140. Accordingly, Paris Ultra is entitled to summary judgment on Plaintiffs' false advertising claims.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

### 3.    Collateral Estoppel

Paris Ultra argues Ms. Gibson, Ms. Canas, and Ms. Pepaj are collaterally estopped from litigating their Lanham Act claims and claims arising under Arizona law.[8] (Doc. 40 at 21–22.) "Defensive collateral estoppel applies 'when a defendant seeks to prevent a plaintiff from asserting a claim the plaintiff has previously litigated and lost against another defendant." *Masson v. New Yorker Mag.*, 85 F.3d 1394, 1400 (9th Cir. 1996) (internal quotations omitted). Paris Ultra "bears the burden of showing with clarity and certainty what was determined by the prior judgment." *Clark v. Bear Stearns & Co.*, 966 F.2d 1318, 1321 (9th Cir. 1992) ("It is not enough that the party introduce the decision of the prior court; rather, the party must introduce a sufficient record of the prior proceeding to enable the trial court to pinpoint the exact issues previously litigated."). In this case, Paris Ultra argues "all elements of collateral estoppel are met" as to Ms. Gibson, Ms. Canas, and Ms. Pepaj. (Doc. 40 at 22.) But Paris Ultra "makes no showing that the factual circumstances in the cases are the same and warrant the application of collateral estoppel." *Mitcheson*, 2020 WL 7075239 at *17. Accordingly, the Court finds that Paris Ultra's assertions do not possess the "clarity" or "certainty" needed for collateral estoppel to apply.

## IV.    CONCLUSION

To summarize, Plaintiffs' false association claims under the Lanham Act, Ms. Sampedro's false light claim for her image published on June 30, 2018, and the false light claims alleged by Ms. Campos and Ms. Pepaj will proceed to trial. The issue of damages under Ms. Pepaj, Ms. Canas, Ms. Ruiz, Ms. Campos, and Ms. Sampedro's right of publicity claims will also proceed to trial. At trial, each expert will be permitted to testify to their expert opinions.

Accordingly,

**IT IS ORDERED denying** Plaintiffs' Motion to Strike the Expert Report and Testimony of Michael Einhorn (Doc. 37); Defendant's Motion to Strike the Report and Testimony of Stephen Chamberlin (Doc. 50); and Defendant's Motion to Strike the Report

---

[8] The Court notes that Ms. Gibson has not alleged any claims arising under Arizona law in this matter.

and Testimony of Martin Buncher (Doc. 51).

**IT IS FURTHER ORDERED** that Plaintiffs' Motion for Summary Judgment (Doc. 39) is **granted in part** and **denied in part**. Plaintiffs' Motion for Summary Judgment is **granted** in favor of Plaintiffs as to the issue of liability on Ms. Pepaj, Ms. Canas, Ms. Ruiz, Ms. Campos, and Ms. Sampedro's right of publicity claims. Plaintiffs' Motion for Summary Judgment is **denied** as to all other claims.

**IT IS FURTHER ORDERED** that Defendant's Motion for Summary Judgment (Doc. 40) is **granted in part** and **denied in part**. Defendant's Motion for Summary Judgment is **granted** in favor of Defendant as to Plaintiffs' claims for invasion of privacy by false light for images published before March 1, 2018 and as to Plaintiffs' claims for false advertising under the Lanham Act. Defendant's Motion for Summary Judgment is **denied** as to all other claims.

**IT IS FINALLY ORDERED** setting a trial-setting conference for **Thursday, March 4, 2021, at 11:00 A.M.**, in Courtroom 503, Sandra Day O'Connor U.S. Federal Courthouse, 401 W. Washington St., Phoenix, Arizona 85003-2151. Participants shall have their calendars available and be prepared to schedule dates for a Final Pretrial Conference and for trial. In-person appearance is preferred; however, the Court will permit telephonic appearance upon request.

Dated this 18th day of February, 2021.

Michael T. Liburdi
United States District Judge